**REHABILITATIVE CARE SYSTEMS OF AMERICA, Appellant,**

v.

**Robert Jerry DAVIS and Kathy Davis, Appellees.**

No. 06–00–00042–CV.

Court of Appeals of Texas, Texarkana.

Submitted Jan. 18, 2001.

Decided March 28, 2001.

David V. Wilson, II, Troy A. Williams, Hays, McConn, Rice & Pickering, Houston, for appellant.

Clay Wilder, Wilder & Wilder, PC, Henderson, Andy W. Tindel, Tyler, for appellee.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

GRANT, Justice.

Rehabilitative Care Systems of America (RCSA) appeals the trial court's judgment awarding Robert Jerry Davis and Kathy Davis $121,949.92, plus post-judgment interest and court costs, in a medical malpractice action. An additional defendant, Baylor Medical Center of Gilmer, was found not liable and is not a party to this appeal.

### Statement of Facts

Robert Jerry Davis was a resident of Winnsboro, Texas, and at the time of the trial of this cause was fifty-two years old and was employed as a truck driver for Palestine Contractors at East Mountain.

In October of 1991, Davis and another man were operating their own business hauling saltwater for the oil and gas industry, Davis's job involving the driving of a truck. While so employed, he was pulling a load off the highway and onto a side road. The culvert had washed out on the side road, and when his truck hit the affected area, he was caused to bounce against the ceiling and door inside the truck cab, injuring his shoulder.

Davis was treated for his injuries by Dr. James Harris of Tyler, Texas, who diagnosed Davis's injury as an "impingement" in his left shoulder. After trying more conservative treatment, including physical therapy, and after an MRI examination, Dr. Harris ultimately performed arthroscopic surgery on Davis's shoulder in 1992. Davis testified he was not advised by Dr. Harris after the surgery that he had a torn rotator cuff. Dr. Harris then recommended that Davis undergo physical therapy in order to strengthen his arm and shoulder so he could return to work. Davis wanted the physical therapy done at Baylor Medical Center in Gilmer, where he had previously undergone physical therapy and had been favorably impressed.

While Dr. Harris continued as the supervising physician, Davis's physical therapy treatment was overseen by Johnny Lee–On, a licensed physical therapist, and Penney Downey, a college student intern training to be a physical therapist assistant, and a third person who functioned in a capacity similar to a secretary. Davis estimated that Lee–On oversaw about seventy-five percent of his therapy and Downey about twenty-five percent. Davis testified that in overseeing his therapy, both therapists would be physically present in the treatment room, within sight of him. When first beginning physical therapy, Davis said that his arm was very weak, with almost no strength, but that as his treatment progressed, his strength gradually returned and he was able to better

perform tasks in the physical therapy treatment and personal tasks at home.

On June 10, 1992, Davis was continuing his physical therapy on a machine referred to as the "Total Gym," which he described as:

> [B]asically a board with an elevating type deal that would slide to pull your body weight with a series of cables and pulleys and a handlebar type deal to use to pull your arms down to do the weights—to pull your body weight to build your body up, set at different levels for different weights.

He admits that Lee–On and the other physical therapy personnel instructed him on how to use the Total Gym, and that one of these people normally stayed with him while he was performing his exercises. Davis had been using the Total Gym for four to six weeks prior to the incident in question, and testified that he "knew how to do it." On the date in question, he had finished performing his first set of exercises and was going on to the second set. At that time, he noticed that the machine was pulling harder than usual. He told Downey about the problems, and she assisted him in lowering the machine back down. Downey then made some adjustments to the machine, which Davis testified he could hear her doing but could not see because he was lying down, facing away from that part of the Total Gym. At that time, Lee–On was not present. Davis testified that he was able to complete the second set of exercises in a normal manner. As he began the third set, he noticed the machine appeared "to pull hard again." The exercise he was attempting to perform at that time required that he lie flat on his back, reach up, grab the handlebar apparatus with a grip on either end, and pull it down and forward to his thigh area, keeping his arms straight. He had pulled himself approximately one half to three quarters of the way up with his body weight while holding on to the bars. As Davis attempted to lower himself back down to the starting position, he testified that all of the weight went down at once. He could not get his left hand loose from the handlebar, and his left arm was pulled over his head with his own weight hanging on it. At the time of the incident, Davis testified that Downey had left the room and Lee–On was not present; no one was with him when it happened. The exercise machine was in a separate room in the physical therapy area. Davis testified that he screamed out when the incident happened.

Lee–On and Downey quickly returned to the area. Lee–On treated Davis with "electronic acupuncture" and applied ointment to ease the pain, cancelled the physical therapy session for the next day, sent him home, and told him to contact his doctor. Davis described the pain as "excruciating," different from the pain he felt as a result of his first injury. Dr. Harris ordered another MRI examination and then performed the surgery for the torn rotator cuff.

Davis testified that in addition to the in-house physical therapy performed at Baylor Medical Center at Gilmer, Lee–On also provided him with two weights with which he was instructed to exercise at home. These weighed a pound and a half each, and he strapped them around his wrists and did arm curls with them. He testified that he did not tear his rotator cuff by using these weights. He did say that he told an individual in the physical therapy department that he had "overdone it" on the previous day, but he says he was referring to a longer walk than usual that he had taken with his wife.

Following the incident and up until the time of and after the second surgery, Davis's life was adversely affected. He testified that he was in constant pain after

the June 10, 1992 incident. He testified he was kept from doing ordinary activities such as bathing, dressing himself, and shaving. His arm was too weak to lift anything. He stated that his old job, paying $2,500 per month, was available after his first accident and was being held for him up until the time of the June 10th incident with the Total Gym. When he was finally released by the doctor to return to work after the second surgery, around September 1994, that job was no longer available. The medication Davis was required to take prevented him from having normal sexual relations with his wife for about a six-month period.

Dr. Harris is a board certified orthopedic surgeon and was Davis's treating physician for both the original injury and the injury alleged to have been caused by the use of the Total Gym. He began his treatment of Davis in late 1991, and diagnosed his initial injury as a contused rotator cuff and probable impingement syndrome, along with a cervical spine sprain. An MRI taken during this treatment did not show a torn rotator cuff. Dr. Harris eventually performed surgery on Davis in March of 1992, which was described as a diagnostic arthroscopy of the humeral joint and arthroscopic decompression of the subacromial joint. Dr. Harris did not notice a tear of the rotator cuff during this surgery. Among the post-operative treatment recommended was physical therapy. Improvement in Davis's condition was noted.

On his June 15, 1992 examination, Davis related to him that he had "hyperabducted," i.e., pulled over his head, his arm while performing one of the physical therapy exercises on June 10 and that his arm was in pain. Dr. Harris noticed difficulty in motion and that Davis's condition was worse at that time than during previous examinations. He testified that based on

reasonable medical certainty, Davis's worsened condition was not inconsistent with the incident with the exercise machine that Davis had described to him. A second MRI showed a torn rotator cuff in the left shoulder. This injury was, again, not inconsistent with the incident as related to him by Davis. Dr. Harris testified that while Davis's progress was not as rapid as expected, Davis was, prior to the June 10 incident, making progress on his recovery, and that the worsened condition he observed beginning June 15 was not inconsistent with Davis's version of the events related to him. A second surgery was performed on October 23, 1992, to repair the torn rotator cuff.

Davis's wife, Kathy Davis, testified that her husband's condition had been improving after undergoing treatment for the first injury in 1991. His previous employer had been contacting him about returning to work. However, when her husband returned from therapy on June 10, 1992, she knew that he was in a great deal of pain, which seemed to continue to worsen. She drove him to see Dr. Harris on June 15, 1992.

Mrs. Davis testified that her husband's quality of life deteriorated after the June 10 incident; he could not hug his children and grandchildren and did not feel like he could be a father or a husband. He could not take a bath, brush his hair, or walk without assistance. She had to assist him with those tasks, both before and after the second surgery. Their sex life was adversely affected due to the medication he was taking. He became more irritable, difficult to get along with, and frustrated.

Mrs. Davis testified that she lost her own job as a cook at a local school as a result of her husband's injuries, because she had to take off too much time to care for him. However, about a year later, she did obtain other employment.

Lee–On testified for RCSA. Lee–On was a licensed physical therapist employed by RCSA to manage the physical therapy department at Baylor Medical Center at Gilmer, Texas. Lee–On was the only licensed physical therapist at the department; he had one assistant. He was familiar with the Total Gym machine and its use in rehabilitation. Lee–On testified that the Total Gym was reliable. The machine involves the lifting of body weight using the machine; no outside force is applied. The machine has settings one through ten, with ten being the maximum setting-the patient lifting his total body weight. The machine is a purely mechanical device; no electronics are involved. The cable on the pulley fits into a groove on the wheel. Lee–On testified that he has never observed the machine fail. Lee–On testified that while it was not necessary for the therapist to stand next to the patient while. he was working with the machine, he does need to be in the vicinity. It was all right for the therapist to step away for a short time, if the patient had developed familiarity with the machine and the exercises to be performed.

Lee–On remembered Davis as one of his patients who had come in with a shoulder injury. The room in which the physical therapy area was located consisted of a room containing the Total Gym machine, and across the hallway some four to five feet away, there was another room with a desk where the assistant usually was seated. A patient using the Total Gym would not be within the line of sight of someone sitting at the desk, but could be heard by the person at the desk. Exhibit 13 was a hand-drawn diagram of the physical therapy area at the Baylor Medical Center in Gilmer. Lee–On admitted that he was not in the room where Davis was exercising when the incident occurred and that he did not know where Penney Downey, a physical therapist assistant student from Kilgore College, was at the time.

At the time of Davis's treatment, Downey was assisting in the physical therapy department. Lee–On's report of the incident stated that Davis "lost control" of the Total Gym machine during the bilateral pectoral fly exercise and that Davis felt pain in the left anterior shoulder. Lee–On could not specify exactly what he meant by "lost control." He was given electrical stimulation of the area, which appeared to ease the pain. There is also mention in the report that Davis told them that he had overdone his at-home exercises the day before. Lee–On was referring to the small hand weights that Davis had been given.

Lee–On testified that it would have been impossible for slack to develop in the machine's cable while the patient was using the equipment. He testified that while he recalled the incident involving Davis, he did not recall him screaming out in pain. Lee–On did not report the incident to the hospital, his superiors, or the manufacturer of the Total Gym machine.

Lee–On testified that a physical therapy assistant could properly assist a patient while exercising and should be there to assist. However, it was acceptable for him or her to step away for a short period of time if the patient was familiar with the exercises. He stated that if something went wrong with the machine while a person was exercising on it, the person could just put his or her feet down on the floor.

He testified that he did supervise Downey's work. The records showed that Downey had worked with Davis on two previous occasions. Lee–On further testified that Downey's stepping out of the room for a moment was not wrong. Lee–On testified that he was not aware of any malfunction of the Total Gym machine in the Gilmer facility.

Downey testified that at the time of the incident, she was a student at Kilgore College training to be a physical therapy assistant. She remembered working as a student assistant at the Baylor Medical Center at Gilmer for Lee–On. She remembered Davis and Davis's working on the Total Gym machine. However, she further testified that she did not recall the equipment malfunction on the Total Gym or Davis's resulting injuries.

Eddie Howard, a licensed physical therapist and an officer in charge of rehabilitative services for East Texas Medical Center Regional Health Care System, was called as an expert witness by RCSA. He testified that once a patient demonstrates efficiency, effectiveness, and safety on the exercise equipment, the physical therapist need not stand right beside the patient while the patient is exercising. After reviewing the report of the incident and relevant definitions, Howard was of the opinion that there was no negligence.

Sandra Pelton was the primary owner of RCSA. She testified that Lee–On was in charge of RCSA's operation at the Baylor Medical Center at Gilmer.

The judgment of the trial court was as follows: Robert Jerry Davis was awarded damages of $63,550, plus prejudgment interest in the amount of $35,743.25. Kathy Davis was awarded $14,500, plus prejudgment interest in the amount of $8,156.67. The judgment amount was to bear interest at ten percent per annum until paid.

*Issue No. 1*

*Did the trial court err in failing to grant RCSA's motion for instructed verdict because the Davises produced no evidence of the standard of care required for physical therapists?*

In this issue, RCSA contends the trial court erred in failing to grant its motion for instructed verdict because the Davises failed to produce any expert testimony regarding the proper standard of care required of physical therapists in providing care to persons such as Davis. RCSA argues that absent such expert testimony, the Davises have produced no evidence of a required element in their case.

In determining whether there is no evidence of probative force to support a jury's finding, all the record evidence must be considered in the light most favorable to the party in whose favor the verdict was rendered, and every reasonable inference deducible from the evidence is to be indulged in that party's favor. A no-evidence point will be sustained when: a) there is a complete absence of evidence of a vital fact; b) the court is barred by rules of law or rules of evidence from giving weight to the only evidence offered to prove a vital fact; c) the evidence offered to prove a vital fact is no more than a mere scintilla; or d) the evidence conclusively establishes the absence of a vital fact. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997).

The following instruction on negligence was submitted to the jury

"**Negligence**" when used with respect to the conduct of REHABILITATIVE CARE SYSTEMS OF AMERICA means failure to use ordinary care, that is, failing to do that which a physical therapist of ordinary prudence would have done under the same or similar circumstances or doing that which a physical therapist of ordinary prudence would not have done under the same or similar circumstances.

To prevail on a medical negligence cause of action, the plaintiff must prove the following: (1) a duty by the medical care provider to act according to the applicable standard of care; (2) a breach of the applicable

standard of care; (3) an injury; and (4) a causal connection between the breach of the standard of care and the injury. *Mills v. Angel,* 995 S.W.2d 262, 267 (Tex.App.—Texarkana 1999, no pet.); *see also* Perdue, *The Law of Texas Medical Malpractice,* 22 Hous. L.Rev. 1, 47 (2d ed.1985). The Amarillo Court of Appeals has ruled that a physical therapist malpractice action is treated exactly like a traditional physician medical malpractice action. *Flores v. Center for Spinal Evaluation and Rehab.,* 865 S.W.2d 261, 264 (Tex.App.—Amarillo 1993, no writ).

■ The standard of care required for medical care givers is higher than the standard of care required of ordinary laypersons. Because physicians and other medical care givers possess greater skill and knowledge than laypersons, and because matters involving such professional skill are not readily comprehensible to laypersons, such individuals' conduct is in a large measure evaluated by professional standards. Perdue, *supra* at 48. Therefore, as a general rule, in order to establish proof of the applicable standard of care in a medical malpractice action, plaintiffs are required to produce expert testimony of such standard. *Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779, 782 (1949); *Mills,* 995 S.W.2d at 268; *Tilotta v. Goodall,* 752 S.W.2d 160, 163 (Tex. App.—Houston [1st Dist.] 1988, writ denied).

■ The courts have, however, recognized exceptions to this general rule. When the underlying negligence involves the standard of non-medical, administrative, ministerial, or routine care at a hospital, expert testimony is not needed because the jury is competent from its own experience to determine and apply such a reasonable care standard. *Mills,* 995 S.W.2d at 268. Examples of such instances are negligence in the use of mechanical instru-

ments, operations on the wrong parts of bodies, sponges or instruments left within the body, or the failure to properly supervise patients under the care of a doctor or institution. Perdue, *supra* at 236.

■ We hold that the Davises were not required to produce expert testimony regarding the standard of care required of a physical therapist in this situation. The Davises did not claim that the therapist put Davis on a machine not suited for his physical capacity; it was not alleged that the rehabilitation program designed by Davis's physical therapist was negligently deficient in any way. The Davises do not contend that Davis was further injured because Lee–On put him in an exercise program which was harmful to restoration of function rather than helpful. Such issues would not be within the common understanding of jurors because they would involve an analysis of the diagnosis and treatment of a plaintiff's condition. Expert testimony would clearly be required to establish the appropriate standard of care for such claims, because they are matters involving professional skill and knowledge not readily comprehensible to laypersons. Perdue, *supra* at 48. However, the sole claim in the present case is that RCSA negligently supervised Davis in carrying out his exercise program by failing to be present or at least nearby to prevent his being injured if the Total Gym malfunctioned. Both Lee–On and Howard were qualified as experts. However, based on a review of their testimony, the standard of care in this type of situation is not beyond the understanding of an average juror, i.e., something that would require expert testimony:

> Q. Okay. When you put a patient on the Total Gym, do you always stand right beside the patient when they're exercising?

A. It depends. If a patient is comfortable—definitely upon first instruction. Let's say a patient has, needs, needs to be instructed in new exercise, needs to be taught new exercise, definitely you give the example and you guard a patient. However, if the patient is very comfortable, has done a couple of sessions already on a piece of equipment, obviously has achieved a certain level of comfortability [sic] with the equipment, then, no, then you don't have to guard them so closely.

. . . .

Q. . . . Is it okay to leave a patient alone on an exercise piece of equipment like the Total Gym if they've demonstrated familiarity with the equipment and familiarity with the exercise routine?

A. Yes. Not—yeah. Again, if you show them the first time, they'll feel a little bit uncomfortable. They have to get the motor learning going on. But after a couple of times, yeah, they'll— they should be able to perform the exercise independently.

Q. And in your opinion, is it okay for a physical therapist to leave the patient exercising on the piece of equipment, or does he—does the therapist have to be standing there with the patient all the time?

A. No, no. The therapist needs to be in the vicinity, though. The therapist needs to be in the vicinity or there must be some assisting personnel in the vicinity. You couldn't walk outside of the hospital while somebody was exercising, for instance.

In the physical therapy area at the Baylor Medical Center at Gilmer, the assisting personnel, therapist or assistant, would always be within either sight or hearing distance of the patients. RCSA's expert, Howard, testified in the same vein:

Q. Is it okay if the patient has demonstrated the ability to use the machine, work the machine, know the exercises for the therapist to go get a file and come back?

A. Yes, it is.

Q. Is it okay for the therapist to go ask another therapist a question and come back?

A. Yes.

Q. Would it be okay for a student therapist to go ask the physical therapist, that is, her supervisor a question and come back?

A. Yes.

. . . .

Q. Does it violate the rules established by the American Physical Therapy Association and the Texas Board of Physical Therapy Examiners to have a therapist or a therapy student to briefly leave a patient alone if the patient has demonstrated the ability to use the machine and is familiar with the exercises?

A. It is within the standard of care.

These are not questions which are incomprehensible to the average juror. These questions are properly considered by jurors without the aid of expert testimony, as illustrated in the following cases:

In *Golden Villa Nursing Home, Inc. v. Smith,* 674 S.W.2d 343 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.), plaintiff was operating his motorcycle on a highway that ran in front of a nursing home. The nursing home, despite having prior knowledge of the tendency of one of its patients to roam off the premises, allowed the patient to go unsupervised for a period of time, during which time the patient wandered out onto the highway and was struck by the plaintiff's vehicle, resulting in injuries. The Houston court, in upholding the liability of the nursing home,

held that while such nursing home's duty does not include "one-on-one nurse/patient ratio or a regular nurse or attendant to follow the patient 24 hours a day," it must consider each patient's physical and mental condition when formulating a standard of care for that individual patient and abide by that standard. *Id.* at 347. There was no expert testimony regarding the standard of care.

In *Mathis v. New York Health Club*, 261 A.D.2d 345, 690 N.Y.S.2d 433 (1999), plaintiff sued the health club for personal injuries sustained while using a weight training machine. Defendant appealed the lower court's order denying its motion to dismiss. Plaintiff was using the weight training machine under the supervision of a trainer, who increased the weight on the machine to 270 pounds, despite plaintiff's expressed doubt at being able to lift that much, and urged the plaintiff to continue his repetitions. The appellate court affirmed, holding that factual issues were raised as to whether plaintiff's injury, which allegedly occurred in the course of the repetitions urged by the trainer, were the result of "culpable misjudgment" by the trainer as to plaintiff's ability to lift that much weight. *Id.*

*South Ripley Cmty. Sch. Corp. v. Peters*, 396 N.E.2d 144 (Ind.Ct.App.1979), was a personal injury suit against a school district by a fourteen-year-old high school student injured while working on a ten-inch circular saw in an industrial arts class. In his attempt to cut pieces of wood on the saw, his hand came too near the circular blade and he lost four fingers. The evidence in that case showed that while the plaintiff student was cutting the wood, the instructor was supervising a drafting class in an adjoining room, which was separated from the shop by a glass partition. The jury awarded damages to the student and his parents. On appeal

the school board challenged one of the jury instructions which asked the jury to find that if the instructor failed to properly supervise the student's use of the circular saw, then the school cannot defeat recovery by showing assumption of risk or contributory negligence. In upholding the instruction, the appellate court held that while schools are not insurers of the safety of the students under their control, "It is not a harsh burden to require school authorities in some instances to anticipate and guard against the conduct of children by which they may harm themselves or others." This issue was properly a factual matter for a jury's determination. *Id.* at 146.

In *Matteucci v. High School Dist.*, 4 Ill.App.3d 710, 281 N.E.2d 383 (1972), the minor plaintiff was a fourteen-year-old high school student injured in his high school wood shop class by using a band saw without the blade guard attached. One of the bases of negligence on the part of the school district alleged the failure to properly supervise the student's use of the machine and instruct on its safe use. The school district appealed a jury verdict in favor of the plaintiff. The evidence in the case was conflicting as to whether the instructor properly taught the students how to use the saw and whether the instructor permitted the saw to be used without the blade guard in place:

> The issue here, therefore, becomes factual as to whether defendant's agent breached its duty of due care and was thus guilty of negligence or whether its agent acted in a reasonable manner so as to eliminate liability. As above shown, this record presents conflicting evidence as to very important facts regarding both instruction and supervision by the teacher. Under these circumstances, the issue of negligence was one

of credibility for determination by the jury.

*Id.* at 386–87.

These decisions illustrate that a jury is frequently called on to determine the appropriate standard of care in negligence actions, and whether the defendant has breached such standard, in factual circumstances quite similar to the present case. In none of these cases was the plaintiff required to present expert testimony as to the appropriate standard of care. The present case, involving only the issue of supervision of an individual using potentially dangerous equipment, clearly does not involve a determination beyond the jurors' ability to determine without expert testimony. .

■ However, even if expert medical testimony is required to establish the standard of care in this case, we would hold that there was sufficient testimony before the jury to establish such standard.

In *Williams v. Bennett,* 610 S.W.2d 144 (Tex.1980), the Supreme Court held that expert testimony required to establish the standard of care in a medical malpractice case may be established through a defendant's or a defendant's expert's own testimony and that it is not necessary that an expert witness so testify in the plaintiff's case. *Id.* at 146; *see also Wynn v. Mid–Cities Clinic,* 628 S.W.2d 809, 811–12 (Tex. App.—Texarkana 1981, writ ref'd n.r.e.); *Ayers v. United States,* 750 F.2d 449, 455 (5th Cir.1985); *Haught v. Maceluch,* 681 F.2d 291, 303 (5th Cir.1982).

In the present case, even if expert testimony is required, the testimony of Lee–On and Howard, both recognized as experts in the field of physical therapy and extensively quoted above, certainly established, the requisite standard of care required of a "supervising" physical therapist when his or her patient is using an exercise machine.

We overrule this contention.

### Issue No. 2

*Did the trial court err in failing to grant RCSA's motion for instructed verdict because the Davises failed to produce legally sufficient evidence, based on a reasonable medical probability that Davis's injuries were caused by RCSA?*

RCSA contends that the Davises' evidence is legally insufficient because they fail to establish, based on reasonable medical probability, that Davis's injuries were caused by the allegedly negligent acts of RCSA.

■ Negligence requires a showing of proximate cause, the components of which are cause in fact and foreseeability. Determining whether an actor's act or omission was a proximate cause of damages is usually a fact issue. Causation in fact requires that the defendant's conduct be a substantial factor in bringing about plaintiff's damages. Liability cannot turn on speculation or conjecture. Establishing causation requires the plaintiff to bring forth sufficient facts so that the evidence, and its logical inferences, support the reasonable probability that the defendant's acts or omissions were a substantial factor in bringing about injury. *Purina Mills, Inc. v. Odell,* 948 S.W.2d 927, 935–36 (Tex. App.—Texarkana 1997, pet. denied).

■ In Texas expert medical testimony can enable a plaintiff's action to go to the jury if the testimony is that there is a reasonable probability of a causal connection between the allegedly negligent act and the present injury. *Parker v. Employers Mut. Liab. Ins. Co. of Wisconsin,* 440 S.W.2d 43, 46 (Tex.1969). Plaintiff's proof must establish a causal connection

based on reasonable medical probability, not mere conjecture, speculation, or possibility. *Bradley v. Rogers,* 879 S.W.2d 947, 953–54 (Tex.App.—Houston [14th Dist.] 1994, writ denied). An expert may appropriately testify concerning possible causes of a plaintiff's condition in order to assist the jury in evaluating other evidence of causation. However, a *possible* cause becomes *probable* only when in the absence of other reasonable causal explanations it becomes more likely than not that the injury was a result of its actions. This is the "outer limit" of inference upon which an issue can be submitted to the jury. *Parker,* 440 S.W.2d at 47; *Blankenship v. Mirick,* 984 S.W.2d 771, 775 (Tex.App.—Waco 1999, pet. denied).

■ A jury may decide the required causal nexus between the event and the plaintiff's injuries where

1. general experience and common sense will enable a layperson to fairly determine the causal connection;

2. expert testimony establishes a traceable chain of causation from the injuries back to the event; or

3. a probable cause nexus is shown by expert testimony.

*Blankenship,* 984 S.W.2d at 775.

■ The causation question in the present case is one determinable only through the testimony of expert medical professionals. *Ins. Co. of N. Am. v. Myers,* 411 S.W.2d 710, 713 (Tex.1966). Causal connection in such cases must rest in reasonable probabilities; otherwise, the inference that such actually did occur is no more than speculation and conjecture. *Lenger v. Physician's Gen. Hosp., Inc.,* 455 S.W.2d 703, 706 (Tex.1970); *Myers,* 411 S.W.2d at 713. When expert medical

testimony establishes only the possibility that the alleged negligent act caused the injury to the plaintiff, rather than a reasonable medical probability, the evidence is not legally sufficient, i.e., it is "no evidence" to support a plaintiff's jury verdict. *Otis Elevator Co. v. Wood,* 436 S.W.2d 324, 331 (Tex.1968). However, "reasonable medical probability" can be based on the evidence as a whole, and it is not absolutely necessary that an expert couch his or her opinion in terms of "reasonable medical probability." *Duff v. Yelin,* 751 S.W.2d 175, 176 (Tex.1988); *Parker v. Employers Mutual Liability Ins. Co. of Wisconsin,* 440 S.W.2d 43, 48 (Tex.1969).

■ Since the existence of the requisite causal connection is a matter of proof, we will review the testimony of Dr. Harris to determine whether there was any evidence that, in reasonable medical probability, Davis's injuries were caused by RCSA's negligent supervision of his exercise activities:[1]

Q Based on reasonable medical probability, the condition that you found him in on June 15, '92, that you described to us as being worse than you had followed up postoperatively, I'm asking whether or not those findings are consistent with the type of exercise hyperabduction he described to you?

A That—that would be consistent. They wouldn't be inconsistent, I guess is a better way to put it.

Q And the pain and problems that he was describing to you on June 15 of '92, did those symptoms, did—did— did they indicate to you any particular condition as far as that injury is concerned?

1. *Compare, Parker v. Employers Mutual Liability Ins. Co. of Wisconsin,* 440 S.W.2d 43, 47 (Tex.1969).

A Well, I think the—what I would take out of this is that he irritated the area. How severely is hard to know. But he, you know, he was—he was doing better. He wasn't out of the woods yet, but he was worse on that visit after—after, you know, this injury, and then he—I just wanted to kind of let him rest and let it calm down.

Q And him being worse, Doctor, do you associate that with what happened to him during the exercise that he described to you?

A Yes.

Q The hyperabduction?

A That's what he related had occurred.

. . . .

Q Mr. Davis previously had an MRI back before the June 1992 exercise incident.

A Yes.

Q Is that right, Doctor? Back when you were treating him originally?

A Yes, I believe he did.

Q Did that MRI show a rotator cuff tear?

A I don't believe it did . . . . no evidence of rotator cuff tear.

. . . .

A Okay. The next MR [sic] was on June 30th. Can I go ahead and relate what it says?

Q Yes, sir.

A Shows his postoperative resection of impingement downward sloping acromion left shoulder. The degree of edema and fluid in the subacromial recess appears to be slightly more than one would expect three months postoperatively. Increased signal intensity in the musculo tenderness junction of the supraspinatus tendon without muscular traction or obvious complete tear. Findings would sug-

gest either a partial tear, at least a degree of tendonitis within the supraspinatus tendon.

Q Doctor, that reference to a partial tear, is that a reference to rotator cuff?

A Yes.

Q The increased swelling in the joint, was that noted, increased edema?

A Yes. In the subacromial recess.

Q More so than would have been expected following his surgery. Is that correct?

A Yes.

Q Is that a finding, Doctor, consistent with the exercise incident that he— that was related to you June 15, 1992?

A Well, it wouldn't be inconsistent with it is the way I would put that.

Q It wouldn't surprise you, someone who had hyperabducted their shoulder postsurgery, to now have an MRI finding such as we're talking about now?

A It—the way I would read this is that there's increased inflammation there, and that wouldn't surprise me that, if he hyperabducted it, he could stir things up again.

. . . .

Q The—the findings that we're discussing now on—on the MRI study, would they be consistent findings for someone who was relating the type of problems that Mr. Davis was relating to you during this period of time?

A They wouldn't be inconsistent.

. . . .

Q The difference, then, Doctor, that the condition you find him in and the treatment that is required in October 7 of 1992, as compared to your

June 15, 1992, visit with him, and, of course, the history being given to you, that is that the hyperabduction incident at the exercise machine, does it appear to you consistent, that is the condition you find him in October 7, '92, is it consistent with what happened to him in June of '92, as far as the cause and effect?

A It's not inconsistent.

Q And do you base that, Doctor, on reasonable medical probability?

A Yes.

On cross-examination, the same doctor testified as follows:

Q Okay. After you did the first surgery, y'all just went in and—and—and looked through a scope. Is that right?

A That's correct.

Q Okay. Is there a chance, the tear being that small, that the tear was there and y'all just would not be able to see it because of the limitations of the scope?

A Yes.

Q Okay. So just because you don't know that there was a tear after the first surgery doesn't mean that it wasn't there? Is that correct?

Q That's correct.

A And you certainly can't say that any incident at physical therapy, if there ever was an incident, caused that tear, can you?

A Can't say that.

Q Can't say that based on reasonable medical probability, can you?

A You can't—you can't say how it was caused.

There was also testimony by Dr. Harris to the effect that he was not actually there when Davis was injured and that Davis could have been lying to him about the alleged incident.

The fact that Dr. Harris could not positively testify that Davis was telling him the truth about the June 10, 1992 incident at physical therapy does not affect reasonable medical probability. If he knew or observed the incident itself, he would be a fact witness rather than an expert witness. After testifying that his first MRI of Davis did not show a torn rotator cuff, Dr. Harris acknowledged that the tear could have been so slight as to have not been picked up by the first MRI; in other words, the tear could have been in existence at the time of the alleged incident. The acknowledgment that the first MRI might have missed a very small tear is only the acknowledgment by Dr. Harris that he might be wrong. However, Dr. Harris did testify that on Davis's June 15, 1992 visit, Davis was worse off than when he saw him on previous visits after the first surgery. While he could not testify factually that the exercise incident caused the injury, he did say that, to a reasonable medical probability, if the incident occurred as related to him by Davis, it could have caused the torn rotator cuff that he observed prior to and during the second surgery. To be "probable," an event need only be likely to occur. RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1541 (2d ed.1987). The above-cited cases require more than mere speculation, but they do not require absolute certainty. We hold that Dr. Harris's testimony established causation to a reasonable medical probability, and we overrule this contention.

*Issue No. 3*

*Did the trial court err in overruling RCSA's motion for new trial on grounds of factual insufficiency of evidence?*

RCSA contends that the trial court should have granted its motion for new

trial because the jury's verdict was against the great weight and preponderance of the evidence, i.e., on grounds of factual insufficiency. The trial court allowed the motion to be overruled by operation of law.

 In a factual sufficiency point, the court of appeals considers and weighs all of the evidence in the case and may set aside the verdict and remand for a new trial if it concludes that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). To be reversible on the basis of factual insufficiency, the finding of the trier of fact must be so against the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986), *rev'd on other grounds, Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 388 (Tex.2000). However, the appellate court cannot substitute its own judgment for that of the trier of fact. It is the province of the jury to pass on the weight and credibility of a witness's testimony. *Leibman v. Grand,* 981 S.W.2d 426, 429 (Tex.App.—El Paso 1998, no pet.).

 In support of its argument, RCSA points to Lee–On's testimony regarding the reliability of the Total Gym machine. Lee–On testified that he never observed a Total Gym machine malfunction and that he did not understand how it could do so. However, Lee–On also confirmed that his written report stated that Davis had "lost control" of the machine during one of his exercises. Lee–On also testified that Davis had been showing improvement in his condition prior to the June 10, 1992 incident, that he was not present in the room when the incident involving Davis occurred, and that he was not exactly sure what did happen to Davis.

Downey's testimony was, basically, that she did not remember what happened that day, but she did acknowledge that she may not have been physically present at the time Davis allegedly had trouble with the Total Gym.

The jury in this case may not have found Lee–On's testimony to have been credible regarding the improbability of the Total Gym malfunctioning. The jury had the opportunity to observe Davis and listen to his version of what happened and to make a judgment as to his credibility. Further, all witnesses testified that Davis's condition was improving, prior to the incident in question, even though Dr. Harris did not see as much improvement as he expected and did testify that Davis was not "out of the woods" yet. Dr. Harris did testify that Davis's condition was worse after the June 10, 1992 incident. This testimony is inconsistent with the suggestion made on the cross-examination of Dr. Harris that there may have been a rotator cuff tear that was not identified at the time of the first MRI.

Reviewing the testimony and evidence presented to the jury in this case, we do not find that its verdict was so against the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. The third contention is overruled.

The judgment of the trial court is affirmed.