NO. 07-09-0181-CV

 IN THE COURT OF APPEALS

 FOR THE SEVENTH DISTRICT OF TEXAS

 AT AMARILLO

 PANEL D

 AUGUST 19, 2011

 MID-CONTINENT GROUP d/b/a/ MID-CONTINENT CASUALTY & MID-
 CONTINENT INSURANCE, APPELLANT

 V.

 KENNETH GOODE, APPELLEE

 FROM THE 72ND DISTRICT COURT OF LUBBOCK COUNTY;

 NO. 2006-536,112; HONORABLE RUBEN REYES, JUDGE

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

 MEMORANDUM OPINION

 Appellant, Mid-Continent Group d/b/a Mid-Continent Casualty & Mid-
Continent Insurance, appeals from a judgment entered in favor of Appellee,
Kenneth Goode, in an action to recover underinsured/uninsured motorist
(UIM) benefits. In support, Mid-Continent broadly presents three issues:
(1) whether Goode's evidence of causation between an automobile accident
and his cervical injury is legally and factually sufficient; (2) whether
Goode's evidence of the reasonableness and necessity of his medical care is
legally and factually sufficient; and (3) whether legally sufficient
evidence supports Goode's right to recover under the UIM provisions of his
policy with Mid-Continent. We affirm.

 Background

 On April 5, 2003, Goode's pickup was struck by another vehicle.
After being struck, Goode attempted to protect and stabilize himself by
holding onto the steering wheel with his left hand. During the accident
investigation he told police officers that he was having trouble with his
left arm and shoulder. His shoulder eventually required surgery; however,
his pain persisted and in 2006 a cervical injury was diagnosed. Mid-
Continent, Goode's UIM insurance carrier, disputed whether the cervical
injury resulted from the 2003 accident. Unable to reach an agreement as to
damages, on August 10, 2006, Goode filed this action to recover under the
UIM provisions of an insurance policy issued by Mid-Continent.

 Pretrial Hearings

 There were three pretrial hearings in this case. At a pretrial
hearing held September 14, 2007, the trial court proposed two methods of
trying the case. The first method involved trying liability and damages,
essentially a lawsuit against an insurance company. The second method
involved treating the action like a regular automobile accident case, a
lawsuit of one driver against the other. During an exchange between the
parties, the following occurred:

 GOODE'S COUNSEL: And [Mid-Continent's counsel] brought up a good
 thing. I was about to address the Court with regard to bringing the
 contract in, talking about the permission, talking about the
 underinsured issues. Do I have the burden of proving that contractual
 relationship, or are we just going to go straight into the PI
 [personal injury] case?

 THE COURT: Are you contesting that?

 MID-CONTINENT'S COUNSEL: I am not contesting the contract. No, I am
 not contesting that coverage would lie under the circumstances.
 Basically, we are -- [Goode's counsel] and I agree that it is a pretty
 simple issue. I am really not contesting liability, other than I am
 contesting causation, and we will kind of get into that with these
 experts.

 THE COURT: Right. And it is just like a regular car wreck. I mean,
 take the insurance element out of this, as far as an underinsured
 claim. There was an accident. There was some injury to this part of
 the body. We don't think the injury to this part of the body is
 related, and this is why. The delay in treatment -- you know, he
 didn't even claim he was injured at that point, whatever. It doesn't
 make any difference.

 One year later, during the pretrial hearing that occurred on
September 19, 2008, the parties continued their discussion as to whether to
try the case as a contract case or a personal injury case:

 THE COURT: All right. Anything else we need to deal with, with
 regard to the depositions? No? Anything else we need to deal with,
 with regard to the Charge?

 MID-CONTINENT'S COUNSEL: Judge, the only thing I have a question
 about is, and, we mentioned it a year ago, and I can't remember what
 all we've talked about, about how to try this case, and we have set it
 up in our Court's Charge, to try Kenneth Goode as Plaintiff, versus
 the driver, William Lee Harris, and try the car wreck case. We are
 going to admit liability. So [Goode's counsel] doesn't have to prove
 up anything regarding liability. It's just a damage issue case, with a
 credit at the end, with the stipulation from [Goode's counsel]. I
 think we may have done that. We probably need to do that again. The
 policy limits were paid at $50,000, on behalf of William Lee Harris'
 insurance company for -- to Mr. Goode on the original claim.

 THE COURT: So you are wanting to try it as -- repeat the first part
 of what you told me, to make sure I've understood what you said.

 MID-CONTINENT'S COUNSEL: That we are trying it as a separate or
 accident case, Mr. Goode against the driver that caused the accident,
 instead of a contract claim against Mid-Continent Insurance Company.

 * * *

 THE COURT: Let me help you there. Normally, in these
 underinsured/uninsured cases, the only issue for the jury to establish
 is liability and then the amount of damages. Here, the defense is
 apparently stipulating to liability. So the only issue is the amount
 of damages, okay?

 * * *

 THE COURT: Okay. With regard to the Charge, then, since you are
 going to stipulate as to liability, we are simply going to have then a
 question on damages, right, one-question charge on damages?

 GOODE'S COUNSEL: On past and present.

 MID-CONTINENT'S COUNSEL: That is right. I mean, we were going to
 stipulate, I think -- I mean, just to be consistent, we are going to
 go ahead and stipulate anyway. But we are trying a car wreck case,
 one party against the other. But I don't think it is going to matter.
 I am not going to try this case on liability. So we are going to
 stipulate as to liability.

 THE COURT: Okay.

 (Emphasis added).

 A third pretrial hearing was held on the day of trial.

 Trial

 A jury trial of Goode's action commenced on September 22, 2008. The
evidence showed that, immediately following that April 2003 automobile
accident, Goode complained of pain in his shoulder.[1] His physician, Dr.
Chavez, referred him to Dr. Nordyke, an orthopedic surgeon. When he
initially visited Dr. Nordyke, Goode complained only of pain in his
shoulder and denied any pain in his neck. After examination, Dr. Nordyke
concluded from Goode's MRI scan and symptoms that he was suffering from a
rotator cuff injury and SLAP tear[2] or torn cartilage to his shoulder.

 In September 2003, Goode underwent surgery to repair his shoulder
injury. Dr. Nordyke subsequently described the surgery as successful and
anticipated that Goode's recovery would last four to six weeks. That same
month, Goode was diagnosed with prostate cancer. In early October, Dr.
Nordyke became concerned because Goode continued to experience pain in his
shoulder. By late October, Goode's shoulder was stiff and he was at the
lower end of where Dr. Nordyke expected he would be after rehabilitation or
physical therapy. Thinking the radiation therapy for the prostate cancer
might be affecting Goode's rehabilitation, Dr. Nordyke treated Goode with
steroids for frozen shoulder or adhesive capsulitis, i.e., inflammation or
tightness in the shoulder. From November 2003 through January 2004,
Goode's symptoms persisted and Dr. Nordyke continued Goode's steroid
treatment. In February 2004, Goode was doing much better and Dr. Nordyke
released him while continuing the steroid treatments for a short period.

 Thereafter, Goode continued to work even though he was experiencing
pain in his shoulder. He did not return to Dr. Nordyke because he thought
the pain would eventually go away and there was no one to relieve him at
work.[3] In July 2005, Goode again saw his physical therapist complaining
of pain in his shoulder. He also sought an impairment rating.

 In December 2005, he went to see Dr. Chavez for a follow-up on his
shoulder. Dr. Chavez diagnosed Goode as suffering from chronic shoulder
pain and muscle atrophy. He again referred Goode to Dr. Nordyke, and, in
March 2006, Goode saw Dr. Nordyke complaining, for the first time, of neck
pain accompanied by numbness in his left arm with tingling sensations going
down his arm. Dr. Nordyke re-evaluated Goode's shoulder and concluded that
Goode had not progressed as he had expected after surgery. When Goode's
shoulder x-rays looked good, Dr. Nordyke suspected that Goode's pain might
be originating in his neck. He decided to look at Goode's cervical spine
and ordered a new MRI scan. This MRI showed some degenerative changes in
the disk and cervical spine. Dr. Nordyke put Goode on steroids and
referred him to Dr. Claude Oliva, a pain management specialist, and Dr.
Nevan Baldwin, a neurosurgeon.

 Dr. Baldwin saw Goode in early April 2006. This time Goode
complained of pain in the base of his neck and, when he was in certain
positions, his neck would lock up. When Dr. Baldwin reviewed Goode's MRI
results, he observed a problem at the C-6, C-7 level of Goode's spine. He
ordered another MRI which confirmed that there was a narrowing of the disk
at that level. Dr. Baldwin concluded that Goode had a ruptured or bulging
cervical disk--cervical radiculitis.

 At trial, Dr. Nordyke opined that Goode injured his neck at the same
time he injured his shoulder, i.e., Goode's cervical disk was also injured
in the April 2003 accident. In retrospect, looking back at Goode's medical
records since the accident, Dr. Nordyke testified that he probably missed
Goode's neck injury because he believed that Goode's lack of progress
during rehabilitation in 2003 and early 2004 was due to his prostate cancer
and radiation treatment coupled with the steroid therapy which "calmed down
[Goode's] cervical radiculitis." He testified that Goode's symptoms from
May 2003 until April 2006 were consistent with having a herniated disk
because Goode was experiencing shoulder pain continuously throughout the
period despite a successful operation repairing his rotator cuff and SLAP
tear. Dr. Nordyke testified that an article from a respected medical
textbook indicated that the condition of having a frozen shoulder or
adhesive capsulitis was "highly associated" with also having cervical
radiculitis or a herniated disk. He further testified that in his normal
practice, ten to fifteen percent of his patients experience no pain with a
cervical disk problem.[4]

 Dr. Baldwin agreed with Dr. Nordyke that Goode's symptoms of a
cervical spine injury arose at the time of the accident and persisted since
that time. He also agreed with Dr. Nordyke that Goode could have injured
his disk in the accident without exhibiting symptoms. Dr. Baldwin
testified that one of the very frequent presentations of a C-6, C-7
herniation[5] is that the pain goes right along the inner edge of the
shoulder blade. He further stated that "just if you touch along the tips
between the shoulder blade and the spine, they get pain and tenderness in
that area, and sometimes coming out toward the shoulder. And then, as
things progress, this symptom gets a little worse, and then they have the
tingling in the hand and so forth."

 Dr. Baldwin testified that Goode's cervical disk problems could have
been caused by the accident, or they might have already been present and
merely advanced over the course of the following years.[6] He further
opined that, regardless whether or not Goode suffered from degenerative
spine conditions prior to the accident, it was possible the accident either
exacerbated a pre-existing condition or caused the condition. He testified
x-rays and MRIs "really do not describe any significant degenerative
changes" and "couldn't say one way or the other whether the spurs found in
Goode were caused by the April 2003 auto accident."

 Dr. James Burke, an orthopedic surgeon, testified as Mid-Continent's
expert. According to his testimony he saw nothing in Goode's records to
indicate that he had problems with his neck at the time of the accident.
In support, he asserted there was no indication Goode complained of neck
pain from April 2003 until April 2006 and observed that, in his opinion,
Goode's degenerative changes would not likely have been caused by trauma.
Rather than suffering from frozen shoulder or adhesive capsulitis after
surgery, Dr. Burke opined that Goode suffered from postoperative stiffness.
 In addition, he testified Goode suffered from spondylosis, a generic term
equivalent to degenerative changes in the spine. He disagreed with Dr.
Nordyke's opinion tying Goode's cervical problems to the 2003 accident
because Dr. Nordyke had previously noted that Goode was negative for neck
problems. He also disagreed whether a C-6, C-7 issue could cause Goode's
shoulder pain because he opined such problems are usually associated with
the C-5 or C-6 nerve root. He opined that, had the accident exacerbated
Goode's symptoms, either from a pre-existing neck condition or had caused
the problems that eventually led to the deterioration of Goode's neck, such
an injury would have been "evidence[d] by the examination and questioning
of Dr. Nordyke at some period more temporal to the injury." As a result,
he concluded that "the car accident of April 5, 2003, did not cause Goode's
current disc and cervical problems."[7]

 On cross-examination Dr. Burke did concede that it was "possible"
that adhesive capsulitis or frozen shoulder could occur as a result of a
minor trauma to the shoulder. He further opined that it was unusual for
Goode to still be having shoulder pain in January 2004, approximately three
months after surgery. He testified that, like Dr. Nordyke, he too had seen
a fair number of patients with shoulder pain having problems with their
neck, but complaining of no neck pain. He had also treated persons with
ruptured cervical disks that didn't have neck pain and agreed with Dr.
Nordyke that "the two can be confused." He also agreed that the diagnosis
of adhesive capsulitis can be associated with cervical radiculitis; but, in
his opinion, that this was not the case with Goode. He testified Goode had
"a stiff and sore shoulder or adhesive capsulitis, following a shoulder
surgery which is completely different entity from frozen shoulder or
adhesive capsulitis, as it presents without shoulder surgery." Finally, he
testified that it was "possible" that the collision in question could have
turned the situation with regard to Goode's neck from asymptomatic to
symptomatic.

 At the trial's conclusion, a single question on the issue of damages
was submitted to the jury.[8] In nine subquestions pertaining to
individual elements of damage, the jury returned a verdict totaling
$289,362.43.[9] In post-verdict proceedings, the trial court denied Mid-
Continent's motion to disregard the jury's findings and, after applying
stipulated credits for sums previously paid and adding pre-judgment
interest, entered a judgment in favor of Goode for $244,467.58, plus court
costs and post-judgment interest at the rate of 5% compounded annually from
March 6, 2009. This appeal followed.

 Discussion

 Mid-Continent asserts Goode's evidence in support of a causal
connection between the accident and his cervical condition was legally and
factually insufficient. Mid-Continent also asserts that Goode's evidence
in support of his medical expenses is legally insufficient because it fails
to establish the necessity of the services or the reasonableness of the
charges. Lastly, Mid-Continent contends Goode's evidence that Mid-
Continent breached its insurance contract with Goode was legally
insufficient.

 Standard of Review--Legal and Factual Sufficiency

 When both legal and factual sufficiency challenges are raised on
appeal, the reviewing court must first examine the legal sufficiency of the
evidence. See Glover v. Tex. Gen. Indemnity Co., 619 S.W.2d 400, 401 (Tex.
1981). In conducting a legal sufficiency review, we must consider the
evidence in the light most favorable to the challenged finding and indulge
every reasonable inference that supports the verdict, City of Keller v.
Wilson, 168 S.W.3d 802, 821-22 (Tex. 2005); crediting favorable evidence if
reasonable jurors could, while disregarding contrary evidence unless
reasonable jurors could not. Id. at 827. A challenge to the legal
sufficiency will be sustained only when (a) there is a complete absence of
evidence of a vital fact, (b) the court is barred by rules of law or of
evidence from giving weight to the only evidence offered to prove a vital
fact, (c) the evidence offered to prove a vital fact is no more than a mere
scintilla of evidence, or (d) the evidence conclusively establishes the
opposite of the vital fact in question. Id. at 810; King Ranch, Inc. v.
Chapman, 118 S.W.3d 742, 751 (Tex. 2003), cert. denied, 541 U.S. 1030,124
S.Ct. 2097, 158 L.Ed.2d 711 (2004). In addition, so long as the evidence
falls within the zone of reasonable disagreement, we may not invade the
fact-finding role of the jurors, who alone determine the credibility of
witnesses, the weight to be given their testimony, and whether to accept or
reject all or a part of their testimony. City of Keller, 168 S.W.3d at
822.

 In reviewing factual sufficiency, the reviewing court must consider,
examine, and weigh the entire record, considering both the evidence in
favor of, and contrary to, the challenged findings. Maritime Overseas
Corp. v. Ellis, 971 S.W.2d 402, 406-07 (Tex. 1998), cert. denied, 525 U.S.
1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998). In doing so, the court no
longer considers the evidence in the light most favorable to the finding;
instead, the court considers and weighs all the evidence, and sets aside
the disputed finding only if it is so contrary to the great weight and
preponderance of the evidence as to be clearly wrong and manifestly unjust.
 Id. at 407; Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996).

 Causation

 "[A]t trial the plaintiff must establish two causal nexuses in order
to be entitled to recovery: (a) a causal nexus between the defendant's
conduct and the event sued upon; and (b) a causal nexus between the event
sued upon and the plaintiff's injuries." Morgan v. Compugraphic Corp., 675
S.W.2d 729, 731 (Tex. 1984). Only the second nexus is at issue here.

 To meet the legal sufficiency standard in a personal injury case,
plaintiffs are required to adduce evidence of a "reasonable medical
probability" or "reasonable probability" that their injuries were caused by
the negligent act, meaning simply that it is "more likely than not" that
the ultimate harm or condition resulted from the negligent act. Jelinek v.
Casas, 328 S.W.3d 526, 532-33 (Tex. 2010). "[R]easonable medical
probability can be based on the evidence as a whole, and it is not
absolutely necessary that an expert couch his or her opinion in terms of
'reasonable medical probability.'" Rehabilitative Care Systems of America
v. Davis, 43 S.W.3d 649, 661 (Tex.App.--Texarkana 2001), pet. denied, 73
S.W.3d 233 (Tex. 2002) (citing Duff v. Yelin, 751 S.W.2d 175, 176 (Tex.
1988). Although a medical expert may not base his or her opinion on "mere
conjecture, speculation, or possibility," Rehabilitative Care Systems, 43
S.W.3d at 663 (citing Bradley v. Rogers, 879 S.W.2d 947, 953-54 (Tex.App.--
Houston [14th Dist.] 1994, writ denied)), the expert may appropriately
testify concerning possible causes of plaintiff's condition in order to
assist the jury in evaluating other evidence of causation. Id.

 Analysis

 As to Mid-Continent's first issue, we must examine the record to
determine whether Goode presented legally and factually sufficient evidence
to establish that "in reasonable medical probability" the accident in
question caused Goode's cervical condition.

 Goode testified at trial that prior to the accident he had no
problems with his neck or his shoulder. Immediately after the automobile
accident he was diagnosed with a shoulder injury and within three years he
was experiencing chronic shoulder pain which continued to the present at
the time of trial. Both Drs. Nordyke and Baldwin agreed that the absence
of neck pain at the time of the accident did not necessarily exclude the
possibility that Goode's neck injury occurred at that time. Furthermore,
Dr. Baldwin testified that a very common presentation of a C-6, C-7
herniation is that the pain runs along the inner edge of the shoulder blade
which sometimes radiates over the shoulder, indicating that neck injuries
can often present themselves as shoulder pain.

 Both Drs. Nordyke and Burke testified that Goode's frozen shoulder or
adhesive capsulitis was associated with having cervical radiculitis or a
herniated disk and Dr. Nordyke relied on an article in a medical textbook
to show that the medical community recognized these symptoms as being
"highly associated." While Dr. Nordyke opined that Goode's shoulder pain
following successful surgery indicated the possibility of a cervical
injury, Dr. Burke opined that Goode's stiffness following surgery was a
postoperative condition caused by the surgery and not the accident. Dr.
Burke also testified that adhesive capsulitis could occur as the result of
minor trauma to the shoulder and that a collision, such as the collision in
question, could have turned a neck problem from asymptomatic to
symptomatic.

 While Dr. Burke's opinion that Goode's current disk problems were not
caused by the accident in question was based on Dr. Nordyke's failure to
identify a neck injury shortly after the accident, Dr. Nordyke testified
that he may have missed the diagnosis due to Goode's prostate cancer and
radiation treatment. Dr. Nordyke also testified that Goode's steroid
therapy would have quieted any cervical issue in addition to treating the
inflammation in his shoulder. Dr. Nordyke testified that it was not until
Goode visited him in April 2006 complaining of a tingling sensation in his
fingers and pain in his arm that he came to suspect that Goode had also
injured his neck in the accident.

 Mid-Continent asserts that Goode's evidence of causation is
predicated solely on Dr. Nordyke's reference to an article in a medical
textbook.[10] We disagree. Reasonable medical probability can be based on
the evidence as a whole. Rehabilitative Care Systems, 43 S.W.3d at 663
(citing Duff v. Yelin, 751 S.W.2d 175, 176 (Tex. 1988)).

 Mid-Continent also contends that Dr. Nordyke's opinions lack
probative value because he ignores the fact that Goode's MRI evidences no
abnormalities at C-5 and he disregards the absence of temporal proximity
between the accident and the onset of neck pain. In that regard, Dr.
Burke testified that neck problems are usually related to the C-5 or C-6
nerve root while Dr. Baldwin testified that his second MRI confirmed a
narrowing of Goode's disc at the C-6, C-7 level. Furthermore, Dr. Baldwin
recognized that Goode had degenerative changes in his spine in the 2006
MRIs but opined that he believed the accident either caused or exacerbated
whatever degenerative processes Goode was experiencing in the following
years. Dr. Baldwin also testified that Goode's x-rays and MRIs did not
describe any significant degenerative changes and, because the changes
occurred in a single level, Goode's x-rays and MRIs indicate or hint that,
at some point, there was a concentration of force, or injury at that
level.[11] Accordingly, Dr. Nordyke does not ignore the cervical
abnormalities, he simply disagrees with Dr. Burke that degenerative changes
were the cause of Goode's neck pain in 2006. As to the question of
temporal proximity, although there was a three year span between the
accident in 2003 and Goode's complaint of neck pain in 2006, Dr. Nordyke's
opinion evidence closed the gap by establishing the medically-recognized
association between a shoulder and neck abnormality, Goode's failure to
fully recover after a successful reparation of his shoulder issues, and
Goode's chronic shoulder pain during the entire period. Both Drs. Nordyke
and Baldwin testified that Goode exhibited symptoms of cervical radiculitis
from the date of the accident forward. Dr. Nordyke testified that he
failed to diagnose the neck issue earlier because of Goode's diagnosis of
prostate cancer and his steroid treatment not only masked the pain in
Goode's shoulder but also any issues with his neck. Although evidence of
temporal proximity is relevant to the issue of causation, the absence of
temporal proximity does not exclude causation any more than the presence of
temporal proximity, by itself, establishes medical causation. See Guevara
v. Ferrer, 247 S.W.3d 662, 668 (Tex. 2007). Thus, the fact that Goode's
neck issues did not present themselves until three years after the
accident, by itself, does not render Dr. Nordyke's or Dr. Baldwin's
opinions speculative or conjecture as a matter of law.

 In the final analysis, Goode's experts, Drs. Nordyde and Baldwin,
simply disagreed with Mid-Continent's expert, Dr. Burke, on a number of
issues. The resolution of conflicts in opinion is best left to the finders
of fact. See City of Keller, 168 S.W.3d at 822; Cantu v. Pena, 650 S.W.2d
906, 909-10 (Tex.App.--San Antonio 1983, writ ref'd n.r.e.). In this case,
those conflicts were simply resolved by the jury in Goode's favor. Based
upon the record, we cannot say that the evidence that Goode suffered a
cervical injury as a result of the accident is so weak as to do no more
than create a mere surmise or suspicion of fact. Nor can we say the jury's
implied finding to that effect is so against the great weight and
preponderance of the evidence as to be clearly wrong or manifestly unjust.
See generally Rehabilitative Care Systems, 43 S.W.3d at 663; Cantu, 650
S.W.2d at 910. Mid-Continent's first issue is overruled.

 Medical Expenses

 By its second issue, Mid-Continent challenges a portion of the jury's
award for past and future medical care. In doing so, it challenges the
legal sufficiency of the evidence establishing the necessity of the care
and the reasonableness of the associated expense. Specifically, it
challenges $7,474.89 of the $37,188.25 awarded for past medical
expenses[12] and all of the $59,094.18 awarded for future medical expenses.
 Mid-Continent contends the verdict lacks the support of legally sufficient
evidence because expert proof of reasonableness and necessity is missing.
We disagree.

 Past Medical Expenses

 As to past medical expenses, in both the opening and closing
statements to the jury, Mid-Continent's counsel asserted that past medical
expenses associated with Goode's shoulder injury were proper and should be
awarded.[13] Immediately following opening statements Goode's counsel
tendered numerous exhibits, including an exhibit entitled Summary of
Damages, in support of his claim for damages: $37,188.25 for total past
medical care and $59,094.18 for total future medical care.[14] When asked
by the trial court whether Mid-Continent had any objection to the admission
of these exhibits, Mid-Continent's counsel replied, "No objection, Your
Honor."[15] Although he does not specifically identify during closing
arguments what expenses his $36,000 reference was intended to identify, a
review of the record indicates that the only reasonable reference would be
to the $37,188.25 for past medical care identified in the Summary of
Damages, previously introduced without objection.

 Thus, having stipulated to the admission of Goode's trial exhibit
evidencing his past medical expenses and prospective charges for future
medical services; see Tex. R. Civ. P. 11 (providing that agreements made
between parties are enforceable if made in open court and entered of
record); Bufkin v. Bufkin, 259 S.W.3d 343, 355 (Tex.App.--Dallas 2008, pet.
denied), and having agreed that Goode's claim for past medical care was
"proper" and "legitimate," Mid-Continent will not now be heard to contest
the jury's finding as to that element of Goode's damages. Mid-Continent's
"stipulation is a binding contract between the parties and the court,
serves as proof on an issue that would otherwise be tried, is conclusive on
the issue addressed, and estops the parties from claiming to the contrary."
 Solares v. Solares, 232 S.W.3d 873, 883 (Tex.App.--Dallas 2007, no pet.)
(citing Houston Lighting & Power Co. v. City of Wharton, 101 S.W.3d 633,
641 (Tex.App.--Houston [1st Dist.] 2003, pet. denied)). Accordingly, the
jury's finding as to past medical care is supported by legally sufficient
evidence.

 Future Medical Expenses

 As to future medical expenses, Texas follows the "reasonable
probability" rule. Fisher v. Coastal Transport Co., 149 Tex. 224, 228-29,
230 S.W.2d 522, 524 (1950); Bituminous Cas. Corp., 223 S.W.3d 485 (Tex.App.-
-Amarillo 2006, no pet.); Hughett v. Dwyre, 625 S.W.2d 401 (Tex.App.--
Amarillo 1981, writ ref'd n.r.e.). Adhering to that rule, Texas courts
have consistently held that the award of future medical expenses is a
matter primarily for the jury to determine. No precise evidence is
required and the jury may base its award upon the nature and extent of the
injuries, the progress toward recovery of the injured party under the
treatment already provided, the reasonable cost of medical care rendered in
the past, and the physical condition of the injured party at the time of
trial. Edens-Birch Lumber v. Wood, 139 S.W.2d 881, 887 (Tex.Civ.App.--
Beaumont 1940, dism'd judg. corr). See also Ibrahim v. Young, 253 S.W.3d
790, 808-09 (Tex.App.-Eastland 2008, pet. denied); Bituminous Cas. Corp.,
223 S.W.3d at 490-91. Nonetheless, a plaintiff seeking recovery for future
medical expenses must show there is a reasonable probability that medical
expenses resulting from the injury will be incurred in the future and the
reasonable costs of such care. Bituminous Cas. Corp., 223 S.W.3d at 490.
Here, Dr. Baldwin, the neurosurgeon, testified of Goode's need for surgery,
and Goode introduced evidence of its likely cost.

 Under the record in this case, we conclude that the evidence was
legally sufficient to support the submission of the issue regarding the
amount of medical expenses that, in reasonable probability, Goode would
incur in the future. Furthermore, we conclude that the evidence is legally
sufficient to support the jury's answer to that issue. Accordingly, Mid-
Continent's second issue is overruled.

 Breach of Contract

 Mid-Continent next asserts that the record is devoid of any evidence
in support of a requisite element of Goode's breach of contract claim
because Goode failed to proffer evidence of Mid-Continent's policy
provisions permitting recovery. A plaintiff seeking recovery against an
insurance company for injuries resulting from the negligence of an
uninsured/underinsured motorist must plead and prove that, at the time of
the accident, the plaintiff was protected by UIM coverage. Mid-Century
Ins. Co. v. McLain, No. 11-08-0097-CV, 2010 Tex.App. LEXIS 1719, at *5
(Tex.App.--Eastland March 11, 2010, no pet.) (mem. op.). Having reviewed
the record, supra, we find that Mid-Continent stipulated to liability
during pretrial proceedings. See Tex. R. Civ. P. 11. Furthermore, by
agreement, the case was tried as an automobile accident case with a single
issue pertaining to damages caused by the accident. Because Mid-Continent
stipulated to liability on the insurance contract, Goode was not required
to offer proof on that issue, and Mid-Continent is barred from disputing
it. Solares, 232 S.W.3d at 883; Hansen v. Academy Corp., 961 S.W.2d 329,
335 (Tex.App.--Houston [1st Dist.] 1997, pet. denied). Accordingly, the
parties' stipulation is sufficient evidence of Mid-Continent's liability
pursuant to its insurance contract. Mid-Continent's third issue is
overruled.

 Conclusion

 The trial court's judgment is affirmed.

 Patrick A. Pirtle
 Justice
-----------------------
[1]Goode testified that he had no problems with his shoulder or neck prior
to the accident,.

[2]A SLAP tear is an injury to a part of the shoulder joint. It is an
acronym for Superior Labrum from Anterior to Posterior.

[3]Goode is a contract lease operator for a petroleum company. As such, he
was required to single-handedly take care of production and perform minor
maintenance on numerous oil wells.

[4]Dr. Nordyke practices arthroscopic and sports medicine surgery. He
specializes in upper extremity issues and does "quite a bit of shoulder
work."

[5]Dr. Baldwin described Goode's ruptured or bulging disk as a condition
that develops over a long period of time. He testified that, when the disk
is injured, "if it's torn, for example, and ruptures over the course of
time, typically, the disk will lose its water content, and as it does so,
the water keeps it kind of spongy and soft and lets the disk perform its
natural function to be our body's shock absorber. When the disk loses its
water content, it becomes more firm, it loses its sponginess and will lose
its height. The bones come closer together as the disc height is lost.
And associated with that, usually, is some bone spur formation and some
other changes which were seen in Mr. Goode's MRI." He testified "[t]hose
changes [in Goode's spine] oftentimes are long--long-standing, and so they
could have actually been there at the time of the accident. And, because it
was after the accident, when we first saw the patient, and it was years
before they first--to my knowledge, anyway, the first MRI was obtained,
those changes could have been initiated at the time of the accident, and
they could have advanced over the course of the following years. . . ."

[6]Dr. Baldwin testified that Goode's second MRI confirmed there was a
narrowing of the disk at the C-6, C-7 level at the opening on the side of
the spine where the nerve exits to go down the arm, the seventh root coming
down from the top of the left side of the spine.

[7]Dr. Burke did agree that Goode's shoulder was injured in the April 2003
automobile accident.

[8]Question 1 stated "[w]hat sum of money, if paid now in cash, would
fairly and reasonably compensate Kenneth Goode for his injuries, if any,
that resulted from the occurrence in question?"

[9]The jury's award included: $25,000 for past physical pain, $25,000 for
future physical pain, $58,080 for future loss of earning capacity, $4,000
for disfigurement, $6,000 for future disfigurement, $25,000 for past
physical impairment, $50,000 for future physical impairment, $37,188.25 for
past medical expenses, and $59,094.18 for future medical expenses.

[10]To the extent Mid-Contintent challenges the reliability of Dr.
Nordyke's textbook reference as a basis for his opinion, Mid-Continent
failed to object to the evidence when it was offered at trial. See
Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 410 (Tex. 1998) ("To
preserve a complaint that scientific evidence is unreliable and thus, no
evidence, a party must object to the evidence before trial or when the
evidence was offered.") "Without a timely objection to the reliability of
the scientific evidence, the offering party is not given an opportunity to
cure any defect that may exist, and will be subject to trial and appeal by
ambush." Id. at 409 (citing Marbled Murrelet v. Babbitt, 83 F.3d 1060,
1066-67 (9th Cir. 1996), cert. denied, 519 U.S. 1108, 117 S.Ct. 942, 136
L.Ed.2d 831 (1997)). Although Mid-Continent tested Dr. Nordyke's
credentials as an expert by objection prior to trial, Mid-Continent did not
object to this evidence at trial.

[11]Dr. Baldwin also testified that he had no basis to dispute Dr.
Nordyke's opinion that Goode had cervical spine and shoulder problems since
the accident and Goode's cervical spine abnormality was largely masked by
his shoulder symptoms. Dr. Baldwin testified that, given Dr. Nordyke's
expertise on shoulder issues, he completely deferred to Dr. Nordyke's
opinion on the matter.

[12]Mid-Continent challenges the past medical expenses for services
provided by Dr. Nordyke ($4,968.89), ASLAN ($156.00), Dr. Strahan
($1,230.00), Dr. Mould ($780.00), and NWTX Imaging Associates, P.A.
($340.00). Although acknowledging that evidence of these amounts were
introduced into evidence, Mid-Continent argues that "none of the foregoing
exhibits [are] probative of reasonable and necessary medical-care expense
because such statements, standing alone, do not 'constitute evidence of
probative force that the charges are reasonable.'" (Citation to internal
quotation omitted).

[13]In his opening statement, Mid-Continent's counsel said, "It's not the
damages to the shoulder. Doesn't have anything to do - those - those are
proper damages." In his closing statement he said, "I will tell you right
now that the 36,000 for the shoulder repair is absolutely legitimate, and
we have no objection to that. We told you very early on that that was not
a problem, and you should award that, because that is legitimate."

[14]Ultimately, the jury accepted this summary and awarded these damages -
to the penny.

[15]At the September 19, 2008, pretrial hearing held less than a week
before trial, Mid-Continent's counsel represented that Mid-Continent
stipulated to the admissibility of all plaintiff's trial exhibits with the
exception of a letter from Dr. Baldwin to Goode's counsel. At that
hearing, the following exchange occurred:

 GOODE'S COUNSEL: I believe this is the same issue that was brought up
 in their Daubert challenge, and that you have already ruled on the
 contents of the letter and deemed it admissible. Beyond that one
 issue, I think we are in agreement on everything else that I have
 proffered as evidence. Is that correct?

 MID-CONTINENT'S COUNSEL: Yes, sir. That is our understanding as
 well.

 GOODE'S COUNSEL: Which is inclusive of past medical and future
 medical and the manner in which they will be introduced through
 exhibits.

 THE COURT: Okay. With regard to your exhibits, do we have an exhibit
 list? Is that in one of these books?

 * * *

 THE COURT: [Mid-Continent's counsel], when [Goode's counsel] refers
 to all exhibits, except one, it appears that you-all have an agreement
 as to the admissibility thereof. Do you know what he is talking
 about? Is that accurate? Can I accept that as a stipulation?

 MID-CONTINENT'S COUNSEL: Yes, sir; as far as the medical that he
 referred to earlier, the medical affidavits, medical records, so on
 and so forth, I believe that those are essentially the exhibits that
 we are talking about and the exhibits that we would use at trial,
 which we have stipulated as to admissibility.