NO. 07-09-0181-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

AUGUST 19, 2011

_____

MID-CONTINENT GROUP d/b/a/ MID-CONTINENT
CASUALTY & MID-CONTINENT INSURANCE,
APPELLANT

V.

KENNETH GOODE, APPELLEE

_____

FROM THE 72ND DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2006-536,112; HONORABLE RUBEN REYES, JUDGE

_____

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

**MEMORANDUM OPINION**

Appellant, Mid-Continent Group d/b/a Mid-Continent Casualty & Mid-Continent Insurance, appeals from a judgment entered in favor of Appellee, Kenneth Goode, in an action to recover underinsured/uninsured motorist (UIM) benefits. In support, Mid-Continent broadly presents three issues: (1) whether Goode's evidence of causation between an automobile accident and his cervical injury is legally and factually sufficient;

(2) whether Goode's evidence of the reasonableness and necessity of his medical care is legally and factually sufficient; and (3) whether legally sufficient evidence supports Goode's right to recover under the UIM provisions of his policy with Mid-Continent. We affirm.

## Background

On April 5, 2003, Goode's pickup was struck by another vehicle. After being struck, Goode attempted to protect and stabilize himself by holding onto the steering wheel with his left hand. During the accident investigation he told police officers that he was having trouble with his left arm and shoulder. His shoulder eventually required surgery; however, his pain persisted and in 2006 a cervical injury was diagnosed. Mid-Continent, Goode's UIM insurance carrier, disputed whether the cervical injury resulted from the 2003 accident. Unable to reach an agreement as to damages, on August 10, 2006, Goode filed this action to recover under the UIM provisions of an insurance policy issued by Mid-Continent.

### Pretrial Hearings

There were three pretrial hearings in this case. At a pretrial hearing held September 14, 2007, the trial court proposed two methods of trying the case. The first method involved trying liability and damages, essentially a lawsuit against an insurance company. The second method involved treating the action like a regular automobile

2

accident case, a lawsuit of one driver against the other. During an exchange between the parties, the following occurred:

> GOODE'S COUNSEL: And [Mid-Continent's counsel] brought up a good thing. I was about to address the Court with regard to bringing the contract in, talking about the permission, talking about the underinsured issues. Do I have the burden of proving that contractual relationship, or are we just going to go straight into the PI [personal injury] case?
>
> THE COURT: Are you contesting that?
>
> MID-CONTINENT'S COUNSEL: I am not contesting the contract. No, I am not contesting that coverage would lie under the circumstances. Basically, we are -- [Goode's counsel] and I agree that it is a pretty simple issue. I am really not contesting liability, other than I am contesting causation, and we will kind of get into that with these experts.
>
> THE COURT: Right. And it is just like a regular car wreck. I mean, take the insurance element out of this, as far as an underinsured claim. There was an accident. There was some injury to this part of the body. We don't think the injury to this part of the body is related, and this is why. The delay in treatment -- you know, he didn't even claim he was injured at that point, whatever. It doesn't make any difference.

One year later, during the pretrial hearing that occurred on September 19, 2008, the parties continued their discussion as to whether to try the case as a contract case or a personal injury case:

> THE COURT: All right. Anything else we need to deal with, with regard to the depositions? No? Anything else we need to deal with, with regard to the Charge?
>
> MID-CONTINENT'S COUNSEL: Judge, the only thing I have a question about is, and, we mentioned it a year ago, and I can't remember what all we've talked about, about how to try this case, and we have set it up in our Court's Charge, to try Kenneth Goode as Plaintiff, versus the driver,

3

William Lee Harris, and try the car wreck case. *We are going to admit liability. So [Goode's counsel] doesn't have to prove up anything regarding liability.* It's just a damage issue case, with a credit at the end, with the stipulation from [Goode's counsel]. I think we may have done that. We probably need to do that again. The policy limits were paid at $50,000, on behalf of William Lee Harris' insurance company for -- to Mr. Goode on the original claim.

THE COURT: So you are wanting to try it as -- repeat the first part of what you told me, to make sure I've understood what you said.

MID-CONTINENT'S COUNSEL: That we are trying it as a separate or accident case, Mr. Goode against the driver that caused the accident, instead of a contract claim against Mid-Continent Insurance Company.

* * *

THE COURT: Let me help you there. Normally, in these underinsured/uninsured cases, the only issue for the jury to establish is liability and then the amount of damages. Here, the defense is apparently stipulating to liability. So the only issue is the amount of damages, okay?

* * *

THE COURT: Okay. With regard to the Charge, then, since you are going to stipulate as to liability, we are simply going to have then a question on damages, right, one-question charge on damages?

GOODE'S COUNSEL: On past and present.

MID-CONTINENT'S COUNSEL: That is right. I mean, we were going to stipulate, I think -- I mean, just to be consistent, we are going to go ahead and stipulate anyway. But we are trying a car wreck case, one party against the other. But I don't think it is going to matter. I am not going to try this case on liability. So we are going to stipulate as to liability.

THE COURT: Okay.

(Emphasis added).

A third pretrial hearing was held on the day of trial.

4

**Trial**

A jury trial of Goode's action commenced on September 22, 2008. The evidence showed that, immediately following that April 2003 automobile accident, Goode complained of pain in his shoulder.[1] His physician, Dr. Chavez, referred him to Dr. Nordyke, an orthopedic surgeon. When he initially visited Dr. Nordyke, Goode complained only of pain in his shoulder and denied any pain in his neck. After examination, Dr. Nordyke concluded from Goode's MRI scan and symptoms that he was suffering from a rotator cuff injury and SLAP tear[2] or torn cartilage to his shoulder.

In September 2003, Goode underwent surgery to repair his shoulder injury. Dr. Nordyke subsequently described the surgery as successful and anticipated that Goode's recovery would last four to six weeks. That same month, Goode was diagnosed with prostate cancer. In early October, Dr. Nordyke became concerned because Goode continued to experience pain in his shoulder. By late October, Goode's shoulder was stiff and he was at the lower end of where Dr. Nordyke expected he would be after rehabilitation or physical therapy. Thinking the radiation therapy for the prostate cancer might be affecting Goode's rehabilitation, Dr. Nordyke treated Goode with steroids for frozen shoulder or adhesive capsulitis, i.e., inflammation or tightness in the shoulder. From November 2003 through January 2004, Goode's symptoms persisted and Dr. Nordyke continued Goode's steroid treatment. In February 2004,

---

[1] Goode testified that he had no problems with his shoulder or neck prior to the accident,.

[2] A SLAP tear is an injury to a part of the shoulder joint. It is an acronym for Superior Labrum from Anterior to Posterior.

5

Goode was doing much better and Dr. Nordyke released him while continuing the steroid treatments for a short period.

Thereafter, Goode continued to work even though he was experiencing pain in his shoulder. He did not return to Dr. Nordyke because he thought the pain would eventually go away and there was no one to relieve him at work.[3] In July 2005, Goode again saw his physical therapist complaining of pain in his shoulder. He also sought an impairment rating.

In December 2005, he went to see Dr. Chavez for a follow-up on his shoulder. Dr. Chavez diagnosed Goode as suffering from chronic shoulder pain and muscle atrophy. He again referred Goode to Dr. Nordyke, and, in March 2006, Goode saw Dr. Nordyke complaining, for the first time, of neck pain accompanied by numbness in his left arm with tingling sensations going down his arm. Dr. Nordyke re-evaluated Goode's shoulder and concluded that Goode had not progressed as he had expected after surgery. When Goode's shoulder x-rays looked good, Dr. Nordyke suspected that Goode's pain might be originating in his neck. He decided to look at Goode's cervical spine and ordered a new MRI scan. This MRI showed some degenerative changes in the disk and cervical spine. Dr. Nordyke put Goode on steroids and referred him to Dr. Claude Oliva, a pain management specialist, and Dr. Nevan Baldwin, a neurosurgeon.

---

[3]Goode is a contract lease operator for a petroleum company. As such, he was required to single-handedly take care of production and perform minor maintenance on numerous oil wells.

Dr. Baldwin saw Goode in early April 2006. This time Goode complained of pain in the base of his neck and, when he was in certain positions, his neck would lock up. When Dr. Baldwin reviewed Goode's MRI results, he observed a problem at the C-6, C-7 level of Goode's spine. He ordered another MRI which confirmed that there was a narrowing of the disk at that level. Dr. Baldwin concluded that Goode had a ruptured or bulging cervical disk--cervical radiculitis.

At trial, Dr. Nordyke opined that Goode injured his neck at the same time he injured his shoulder, i.e., Goode's cervical disk was also injured in the April 2003 accident. In retrospect, looking back at Goode's medical records since the accident, Dr. Nordyke testified that he probably missed Goode's neck injury because he believed that Goode's lack of progress during rehabilitation in 2003 and early 2004 was due to his prostate cancer and radiation treatment coupled with the steroid therapy which "calmed down [Goode's] cervical radiculitis." He testified that Goode's symptoms from May 2003 until April 2006 were consistent with having a herniated disk because Goode was experiencing shoulder pain continuously throughout the period despite a successful operation repairing his rotator cuff and SLAP tear. Dr. Nordyke testified that an article from a respected medical textbook indicated that the condition of having a frozen shoulder or adhesive capsulitis was "highly associated" with also having cervical

7

radiculitis or a herniated disk. He further testified that in his normal practice, ten to fifteen percent of his patients experience no pain with a cervical disk problem.[4]

Dr. Baldwin agreed with Dr. Nordyke that Goode's symptoms of a cervical spine injury arose at the time of the accident and persisted since that time. He also agreed with Dr. Nordyke that Goode could have injured his disk in the accident without exhibiting symptoms. Dr. Baldwin testified that one of the very frequent presentations of a C-6, C-7 herniation[5] is that the pain goes right along the inner edge of the shoulder blade. He further stated that "just if you touch along the tips between the shoulder blade and the spine, they get pain and tenderness in that area, and sometimes coming out toward the shoulder. And then, as things progress, this symptom gets a little worse, and then they have the tingling in the hand and so forth."

Dr. Baldwin testified that Goode's cervical disk problems could have been caused by the accident, or they might have already been present and merely advanced over the

---

[4]Dr. Nordyke practices arthroscopic and sports medicine surgery. He specializes in upper extremity issues and does "quite a bit of shoulder work."

[5]Dr. Baldwin described Goode's ruptured or bulging disk as a condition that develops over a long period of time. He testified that, when the disk is injured, "if it's torn, for example, and ruptures over the course of time, typically, the disk will lose its water content, and as it does so, the water keeps it kind of spongy and soft and lets the disk perform its natural function to be our body's shock absorber. When the disk loses its water content, it becomes more firm, it loses its sponginess and will lose its height. The bones come closer together as the disc height is lost. And associated with that, usually, is some bone spur formation and some other changes which were seen in Mr. Goode's MRI." He testified "[t]hose changes [in Goode's spine] oftentimes are long--long-standing, and so they could have actually been there at the time of the accident. And, because it was after the accident, when we first saw the patient, and it was years before they first--to my knowledge, anyway, the first MRI was obtained, those changes could have been initiated at the time of the accident, and they could have advanced over the course of the following years. . . ."

course of the following years.[6] He further opined that, regardless whether or not Goode suffered from degenerative spine conditions prior to the accident, it was possible the accident either exacerbated a pre-existing condition or caused the condition. He testified x-rays and MRIs "really do not describe any significant degenerative changes" and "couldn't say one way or the other whether the spurs found in Goode were caused by the April 2003 auto accident."

Dr. James Burke, an orthopedic surgeon, testified as Mid-Continent's expert. According to his testimony he saw nothing in Goode's records to indicate that he had problems with his neck at the time of the accident. In support, he asserted there was no indication Goode complained of neck pain from April 2003 until April 2006 and observed that, in his opinion, Goode's degenerative changes would not likely have been caused by trauma. Rather than suffering from frozen shoulder or adhesive capsulitis after surgery, Dr. Burke opined that Goode suffered from postoperative stiffness. In addition, he testified Goode suffered from spondylosis, a generic term equivalent to degenerative changes in the spine. He disagreed with Dr. Nordyke's opinion tying Goode's cervical problems to the 2003 accident because Dr. Nordyke had previously noted that Goode was negative for neck problems. He also disagreed whether a C-6, C-7 issue could cause Goode's shoulder pain because he opined such problems are usually associated with the C-5 or C-6 nerve root. He opined that, had the accident exacerbated Goode's

---

[6]Dr. Baldwin testified that Goode's second MRI confirmed there was a narrowing of the disk at the C-6, C-7 level at the opening on the side of the spine where the nerve exits to go down the arm, the seventh root coming down from the top of the left side of the spine.

symptoms, either from a pre-existing neck condition or had caused the problems that eventually led to the deterioration of Goode's neck, such an injury would have been "evidence[d] by the examination and questioning of Dr. Nordyke at some period more temporal to the injury." As a result, he concluded that "the car accident of April 5, 2003, did not cause Goode's current disc and cervical problems."[7]

On cross-examination Dr. Burke did concede that it was "possible" that adhesive capsulitis or frozen shoulder could occur as a result of a minor trauma to the shoulder. He further opined that it was unusual for Goode to still be having shoulder pain in January 2004, approximately three months after surgery. He testified that, like Dr. Nordyke, he too had seen a fair number of patients with shoulder pain having problems with their neck, but complaining of no neck pain. He had also treated persons with ruptured cervical disks that didn't have neck pain and agreed with Dr. Nordyke that "the two can be confused." He also agreed that the diagnosis of adhesive capsulitis can be associated with cervical radiculitis; but, in his opinion, that this was not the case with Goode. He testified Goode had "a stiff and sore shoulder or adhesive capsulitis, following a shoulder surgery which is completely different entity from frozen shoulder or adhesive capsulitis, as it presents without shoulder surgery." Finally, he testified that it was "possible" that the collision in question could have turned the situation with regard to Goode's neck from asymptomatic to symptomatic.

---

[7]Dr. Burke did agree that Goode's shoulder was injured in the April 2003 automobile accident.

At the trial's conclusion, a single question on the issue of damages was submitted to the jury.[8]  In nine subquestions pertaining to individual elements of damage, the jury returned a verdict totaling $289,362.43.[9]  In post-verdict proceedings, the trial court denied Mid-Continent's motion to disregard the jury's findings and, after applying stipulated credits for sums previously paid and adding pre-judgment interest, entered a judgment in favor of Goode for $244,467.58, plus court costs and post-judgment interest at the rate of 5% compounded annually from March 6, 2009.  This appeal followed.

## Discussion

Mid-Continent asserts Goode's evidence in support of a causal connection between the accident and his cervical condition was legally and factually insufficient.  Mid-Continent also asserts that Goode's evidence in support of his medical expenses is legally insufficient because it fails to establish the necessity of the services or the reasonableness of the charges.  Lastly, Mid-Continent contends Goode's evidence that Mid-Continent breached its insurance contract with Goode was legally insufficient.

---

[8]Question 1 stated "[w]hat sum of money, if paid now in cash, would fairly and reasonably compensate Kenneth Goode for *his* injuries, if any, that resulted from the occurrence in question?"

[9]The jury's award included:  $25,000 for past physical pain, $25,000 for future physical pain, $58,080 for future loss of earning capacity, $4,000 for disfigurement, $6,000 for future disfigurement, $25,000 for past physical impairment, $50,000 for future physical impairment, $37,188.25 for past medical expenses, and $59,094.18 for future medical expenses.

**Standard of Review--Legal and Factual Sufficiency**

When both legal and factual sufficiency challenges are raised on appeal, the reviewing court must first examine the legal sufficiency of the evidence. *See Glover v. Tex. Gen. Indemnity Co.,* 619 S.W.2d 400, 401 (Tex. 1981). In conducting a legal sufficiency review, we must consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that supports the verdict, *City of Keller v. Wilson,* 168 S.W.3d 802, 821-22 (Tex. 2005); crediting favorable evidence if reasonable jurors could, while disregarding contrary evidence unless reasonable jurors could not. *Id.* at 827. A challenge to the legal sufficiency will be sustained only when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence, or (d) the evidence conclusively establishes the opposite of the vital fact in question. *Id.* at 810; *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied,* 541 U.S. 1030,124 S.Ct. 2097, 158 L.Ed.2d 711 (2004). In addition, so long as the evidence falls within the zone of reasonable disagreement, we may not invade the fact-finding role of the jurors, who alone determine the credibility of witnesses, the weight to be given their testimony, and whether to accept or reject all or a part of their testimony. *City of Keller*, 168 S.W.3d at 822.

In reviewing factual sufficiency, the reviewing court must consider, examine, and weigh the entire record, considering both the evidence in favor of, and contrary to, the

challenged findings. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406-07 (Tex. 1998), *cert. denied,* 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998). In doing so, the court no longer considers the evidence in the light most favorable to the finding; instead, the court considers and weighs all the evidence, and sets aside the disputed finding only if it is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Id.* at 407; *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996).

**Causation**

"[A]t trial the plaintiff must establish two causal nexuses in order to be entitled to recovery: (a) a causal nexus between the defendant's conduct and the event sued upon; and (b) a causal nexus between the event sued upon and the plaintiff's injuries." *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 731 (Tex. 1984). Only the second nexus is at issue here.

To meet the legal sufficiency standard in a personal injury case, plaintiffs are required to adduce evidence of a "reasonable medical probability" or "reasonable probability" that their injuries were caused by the negligent act, meaning simply that it is "more likely than not" that the ultimate harm or condition resulted from the negligent act. *Jelinek v. Casas,* 328 S.W.3d 526, 532-33 (Tex. 2010). "[R]easonable medical probability can be based on the evidence as a whole, and it is not absolutely necessary that an expert couch his or her opinion in terms of 'reasonable medical probability.'" *Rehabilitative Care Systems of America v. Davis*, 43 S.W.3d 649, 661 (Tex.App.-- Texarkana 2001), pet. denied, 73 S.W.3d 233 (Tex. 2002) (citing *Duff v. Yelin*, 751

S.W.2d 175, 176 (Tex. 1988). Although a medical expert may not base his or her opinion on "mere conjecture, speculation, or possibility," *Rehabilitative Care Systems*, 43 S.W.3d at 663 (citing *Bradley v. Rogers*, 879 S.W.2d 947, 953-54 (Tex.App.-- Houston [14th Dist.] 1994, writ denied)), the expert may appropriately testify concerning possible causes of plaintiff's condition in order to assist the jury in evaluating other evidence of causation. *Id.*

## Analysis

As to Mid-Continent's first issue, we must examine the record to determine whether Goode presented legally and factually sufficient evidence to establish that "in reasonable medical probability" the accident in question caused Goode's cervical condition.

Goode testified at trial that prior to the accident he had no problems with his neck or his shoulder. Immediately after the automobile accident he was diagnosed with a shoulder injury and within three years he was experiencing chronic shoulder pain which continued to the present at the time of trial. Both Drs. Nordyke and Baldwin agreed that the absence of neck pain at the time of the accident did not necessarily exclude the possibility that Goode's neck injury occurred at that time. Furthermore, Dr. Baldwin testified that a very common presentation of a C-6, C-7 herniation is that the pain runs along the inner edge of the shoulder blade which sometimes radiates over the shoulder, indicating that neck injuries can often present themselves as shoulder pain.

Both Drs. Nordyke and Burke testified that Goode's frozen shoulder or adhesive capsulitis was associated with having cervical radiculitis or a herniated disk and Dr.

14

Nordyke relied on an article in a medical textbook to show that the medical community recognized these symptoms as being "highly associated." While Dr. Nordyke opined that Goode's shoulder pain following successful surgery indicated the possibility of a cervical injury, Dr. Burke opined that Goode's stiffness following surgery was a postoperative condition caused by the surgery and not the accident. Dr. Burke also testified that adhesive capsulitis could occur as the result of minor trauma to the shoulder and that a collision, such as the collision in question, could have turned a neck problem from asymptomatic to symptomatic.

While Dr. Burke's opinion that Goode's current disk problems were not caused by the accident in question was based on Dr. Nordyke's failure to identify a neck injury shortly after the accident, Dr. Nordyke testified that he may have missed the diagnosis due to Goode's prostate cancer and radiation treatment. Dr. Nordyke also testified that Goode's steroid therapy would have quieted any cervical issue in addition to treating the inflammation in his shoulder. Dr. Nordyke testified that it was not until Goode visited him in April 2006 complaining of a tingling sensation in his fingers and pain in his arm that he came to suspect that Goode had also injured his neck in the accident.

Mid-Continent asserts that Goode's evidence of causation is predicated solely on Dr. Nordyke's reference to an article in a medical textbook.[10] We disagree.

---

[10]To the extent Mid-Contintent challenges the reliability of Dr. Nordyke's textbook reference as a basis for his opinion, Mid-Continent failed to object to the evidence when it was offered at trial. *See Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 410 (Tex. 1998) ("To preserve a complaint that scientific evidence is unreliable and thus, no evidence, a party must object to the evidence before trial or when the evidence was offered.") "Without a timely objection to the reliability of the scientific evidence, the offering party is not given an opportunity to cure any defect that may exist, and will be subject to trial and appeal by ambush." *Id.* at 409 (citing *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066-67 (9th Cir. 1996), *cert. denied*, 519 U.S. 1108, 117 S.Ct. 942, 136 L.Ed.2d 831 (1997)). Although Mid-Continent tested Dr.

Reasonable medical probability can be based on the evidence as a whole. *Rehabilitative Care Systems*, 43 S.W.3d at 663 (citing *Duff v. Yelin*, 751 S.W.2d 175, 176 (Tex. 1988)).

Mid-Continent also contends that Dr. Nordyke's opinions lack probative value because he ignores the fact that Goode's MRI evidences no abnormalities at C-5 and he disregards the absence of temporal proximity between the accident and the onset of neck pain. In that regard, Dr. Burke testified that neck problems are usually related to the C-5 or C-6 nerve root while Dr. Baldwin testified that his second MRI confirmed a narrowing of Goode's disc at the C-6, C-7 level. Furthermore, Dr. Baldwin recognized that Goode had degenerative changes in his spine in the 2006 MRIs but opined that he believed the accident either caused or exacerbated whatever degenerative processes Goode was experiencing in the following years. Dr. Baldwin also testified that Goode's x-rays and MRIs did not describe any significant degenerative changes and, because the changes occurred in a single level, Goode's x-rays and MRIs indicate or hint that, at some point, there was a concentration of force, or injury at that level.[11] Accordingly, Dr. Nordyke does not ignore the cervical abnormalities, he simply disagrees with Dr. Burke that degenerative changes were the cause of Goode's neck pain in 2006. As to the question of temporal proximity, although there was a three year span between the accident in 2003 and Goode's complaint of neck pain in 2006, Dr. Nordyke's opinion

Nordyke's credentials as an expert by objection prior to trial, Mid-Continent did not object to this evidence at trial.

[11]Dr. Baldwin also testified that he had no basis to dispute Dr. Nordyke's opinion that Goode had cervical spine and shoulder problems since the accident and Goode's cervical spine abnormality was largely masked by his shoulder symptoms. Dr. Baldwin testified that, given Dr. Nordyke's expertise on shoulder issues, he completely deferred to Dr. Nordyke's opinion on the matter.

evidence closed the gap by establishing the medically-recognized association between a shoulder and neck abnormality, Goode's failure to fully recover after a successful reparation of his shoulder issues, and Goode's chronic shoulder pain during the entire period. Both Drs. Nordyke and Baldwin testified that Goode exhibited symptoms of cervical radiculitis from the date of the accident forward. Dr. Nordyke testified that he failed to diagnose the neck issue earlier because of Goode's diagnosis of prostate cancer and his steroid treatment not only masked the pain in Goode's shoulder but also any issues with his neck. Although evidence of temporal proximity is relevant to the issue of causation, the absence of temporal proximity does not exclude causation any more than the presence of temporal proximity, by itself, establishes medical causation. *See Guevara v. Ferrer*, 247 S.W.3d 662, 668 (Tex. 2007). Thus, the fact that Goode's neck issues did not present themselves until three years after the accident, by itself, does not render Dr. Nordyke's or Dr. Baldwin's opinions speculative or conjecture as a matter of law.

In the final analysis, Goode's experts, Drs. Nordyde and Baldwin, simply disagreed with Mid-Continent's expert, Dr. Burke, on a number of issues. The resolution of conflicts in opinion is best left to the finders of fact. *See City of Keller,* 168 S.W.3d at 822; *Cantu v. Pena,* 650 S.W.2d 906, 909-10 (Tex.App.--San Antonio 1983, writ ref'd n.r.e.). In this case, those conflicts were simply resolved by the jury in Goode's favor. Based upon the record, we cannot say that the evidence that Goode suffered a cervical injury as a result of the accident is so weak as to do no more than create a mere surmise or suspicion of fact. Nor can we say the jury's implied finding to that effect is so against the great weight and preponderance of the evidence as to be clearly

wrong or manifestly unjust. *See generally Rehabilitative Care Systems,* 43 S.W.3d at 663; *Cantu,* 650 S.W.2d at 910. Mid-Continent's first issue is overruled.

## Medical Expenses

By its second issue, Mid-Continent challenges a portion of the jury's award for past and future medical care. In doing so, it challenges the legal sufficiency of the evidence establishing the necessity of the care and the reasonableness of the associated expense. Specifically, it challenges $7,474.89 of the $37,188.25 awarded for past medical expenses[12] and all of the $59,094.18 awarded for future medical expenses. Mid-Continent contends the verdict lacks the support of legally sufficient evidence because expert proof of reasonableness and necessity is missing. We disagree.

### Past Medical Expenses

As to past medical expenses, in both the opening and closing statements to the jury, Mid-Continent's counsel asserted that past medical expenses associated with Goode's shoulder injury were proper and should be awarded.[13] Immediately following

---

[12]Mid-Continent challenges the past medical expenses for services provided by Dr. Nordyke ($4,968.89), ASLAN ($156.00), Dr. Strahan ($1,230.00), Dr. Mould ($780.00), and NWTX Imaging Associates, P.A. ($340.00). Although acknowledging that evidence of these amounts were introduced into evidence, Mid-Continent argues that "none of the foregoing exhibits [are] probative of reasonable and necessary medical-care expense because such statements, standing alone, do not 'constitute evidence of probative force that the charges are reasonable.'" (Citation to internal quotation omitted).

[13]In his opening statement, Mid-Continent's counsel said, "It's not the damages to the shoulder. Doesn't have anything to do - those - those are proper damages." In his closing statement he said, "I will tell you right now that the 36,000 for the shoulder repair is absolutely legitimate, and we have no objection to that. We told you very early on that that was not a problem, and you should award that, because that is legitimate."

opening statements Goode's counsel tendered numerous exhibits, including an exhibit entitled *Summary of Damages,* in support of his claim for damages: $37,188.25 for total past medical care and $59,094.18 for total future medical care.[14]  When asked by the trial court whether Mid-Continent had any objection to the admission of these exhibits, Mid-Continent's counsel replied, "No objection, Your Honor."[15]  Although he does not specifically identify during closing arguments what expenses his $36,000 reference was intended to identify, a review of the record indicates that the only reasonable reference would be to the $37,188.25 for past medical care identified in the *Summary of Damages,* previously introduced without objection.

---

[14]Ultimately, the jury accepted this summary and awarded these damages - to the penny.

[15]At the September 19, 2008, pretrial hearing held less than a week before trial, Mid-Continent's counsel represented that Mid-Continent stipulated to the admissibility of all plaintiff's trial exhibits with the exception of a letter from Dr. Baldwin to Goode's counsel.  At that hearing, the following exchange occurred:

> GOODE'S COUNSEL:  I believe this is the same issue that was brought up in their *Daubert* challenge, and that you have already ruled on the contents of the letter and deemed it admissible.  Beyond that one issue, I think we are in agreement on everything else that I have proffered as evidence.  Is that correct?

> MID-CONTINENT'S COUNSEL:  Yes, sir.  That is our understanding as well.

> GOODE'S COUNSEL:  Which is inclusive of past medical and future medical and the manner in which they will be introduced through exhibits.

> THE COURT:  Okay.  With regard to your exhibits, do we have an exhibit list?  Is that in one of these books?

> * * *

> THE COURT:  [Mid-Continent's counsel], when [Goode's counsel] refers to all exhibits, except one, it appears that you-all have an agreement as to the admissibility thereof.  Do you know what he is talking about?  Is that accurate?  Can I accept that as a stipulation?

> MID-CONTINENT'S COUNSEL:  Yes, sir; as far as the medical that he referred to earlier, the medical affidavits, medical records, so on and so forth, I believe that those are essentially the exhibits that we are talking about and the exhibits that we would use at trial, which we have stipulated as to admissibility.

Thus, having stipulated to the admission of Goode's trial exhibit evidencing his past medical expenses and prospective charges for future medical services; *see* Tex. R. Civ. P. 11 (providing that agreements made between parties are enforceable if made in open court and entered of record); *Bufkin v. Bufkin*, 259 S.W.3d 343, 355 (Tex.App.--Dallas 2008, pet. denied), and having agreed that Goode's claim for past medical care was "proper" and "legitimate," Mid-Continent will not now be heard to contest the jury's finding as to that element of Goode's damages. Mid-Continent's "stipulation is a binding contract between the parties and the court, serves as proof on an issue that would otherwise be tried, is conclusive on the issue addressed, and estops the parties from claiming to the contrary." *Solares v. Solares,* 232 S.W.3d 873, 883 (Tex.App.--Dallas 2007, no pet.) (citing *Houston Lighting & Power Co. v. City of Wharton*, 101 S.W.3d 633, 641 (Tex.App.--Houston [1st Dist.] 2003, pet. denied)). Accordingly, the jury's finding as to past medical care is supported by legally sufficient evidence.

Future Medical Expenses

As to future medical expenses, Texas follows the "reasonable probability" rule. *Fisher v. Coastal Transport Co.,* 149 Tex. 224, 228-29, 230 S.W.2d 522, 524 (1950); *Bituminous Cas. Corp.,* 223 S.W.3d 485 (Tex.App.--Amarillo 2006, no pet.); *Hughett v. Dwyre,* 625 S.W.2d 401 (Tex.App.--Amarillo 1981, writ ref'd n.r.e.). Adhering to that rule, Texas courts have consistently held that the award of future medical expenses is a matter primarily for the jury to determine. No precise evidence is required and the jury may base its award upon the nature and extent of the injuries, the progress toward recovery of the injured party under the treatment already provided, the reasonable cost

of medical care rendered in the past, and the physical condition of the injured party at the time of trial. *Edens-Birch Lumber v. Wood,* 139 S.W.2d 881, 887 (Tex.Civ.App.--Beaumont 1940, dism'd judg. corr). *See also Ibrahim v. Young*, 253 S.W.3d 790, 808-09 (Tex.App.—Eastland 2008, pet. denied); *Bituminous Cas. Corp.,* 223 S.W.3d at 490-91. Nonetheless, a plaintiff seeking recovery for future medical expenses must show there is a reasonable probability that medical expenses resulting from the injury will be incurred in the future and the reasonable costs of such care. *Bituminous Cas. Corp.*, 223 S.W.3d at 490. Here, Dr. Baldwin, the neurosurgeon, testified of Goode's need for surgery, and Goode introduced evidence of its likely cost.

Under the record in this case, we conclude that the evidence was legally sufficient to support the submission of the issue regarding the amount of medical expenses that, in reasonable probability, Goode would incur in the future. Furthermore, we conclude that the evidence is legally sufficient to support the jury's answer to that issue. Accordingly, Mid-Continent's second issue is overruled.

**Breach of Contract**

Mid-Continent next asserts that the record is devoid of any evidence in support of a requisite element of Goode's breach of contract claim because Goode failed to proffer evidence of Mid-Continent's policy provisions permitting recovery. A plaintiff seeking recovery against an insurance company for injuries resulting from the negligence of an uninsured/underinsured motorist must plead and prove that, at the time of the accident, the plaintiff was protected by UIM coverage. *Mid-Century Ins. Co. v. McLain,* No. 11-08-0097-CV, 2010 Tex.App. LEXIS 1719, at *5 (Tex.App.--Eastland March 11, 2010, no

21

pet.) (mem. op.). Having reviewed the record, *supra*, we find that Mid-Continent stipulated to liability during pretrial proceedings. *See* Tex. R. Civ. P. 11. Furthermore, by agreement, the case was tried as an automobile accident case with a single issue pertaining to damages caused by the accident. Because Mid-Continent stipulated to liability on the insurance contract, Goode was not required to offer proof on that issue, and Mid-Continent is barred from disputing it. *Solares,* 232 S.W.3d at 883; *Hansen v. Academy Corp.*, 961 S.W.2d 329, 335 (Tex.App.--Houston [1st Dist.] 1997, pet. denied). Accordingly, the parties' stipulation is sufficient evidence of Mid-Continent's liability pursuant to its insurance contract. Mid-Continent's third issue is overruled.

## Conclusion

The trial court's judgment is affirmed.


Patrick A. Pirtle
Justice

22